# EXHIBIT 1

### HEALTHSPACE® MASTER AGREEMENT

This **Master Agreement** (the "Agreement") is effective as of January 27, 2014 ("Effective Date") by and between **Healthcare Interactive, Inc.** ("HCI"), with a principal location at 3060 Route 97 suite 260, Glenwood, MD 21738, and POMCO, Inc. ("Customer"), with a principal location at 2425 James Street, Syracuse, NY 13206.

Customer desires to obtain access to and a license to use certain HCI products and receive certain maintenance and hosting services as specified on attached schedules. This Agreement sets forth the terms under which HCI will provide Customer with such access, grant such license, and and provide such services.

1. **Definitions.** The following definitions shall apply to this Agreement and to all schedules hereunder:

    1.1 "Affiliate(s)" shall mean the following companies: _____.

    1.2 "Authorized User(s)" shall mean any Customer Client, employee, Affiliate, broker, consultant, agent, representative, or Customer Client Member.

    1.3 "Customer Client(s)" shall mean any business customer of Customer for which Customer desires to provide access to the Hosted Application.

    1.4 "Customer Client Member(s)" shall mean the individual quanitifiable members of Customer Clients for which Customer desires to provide acces to the Hosted Application.

    1.4 "Customer Data" shall mean all information and data owned and provided by Customer or an Authorized User to HCI, for the purposes of obtaining Products or Services.

    1.5 "HCI Data" shall mean all databases, data sets and other collections of information provided by HCI to Customer or which Customer licenses from HCI, which may include third party information, pursuant to this Agreement.

    1.6 "Hosted Application" shall mean collectively, the Products and Services.

    1.7 "Products" shall mean all products, documentation, HCI Data, Software, tools, utilities, standards, analysis techniques, methodologies, reports and report formats provided by HCI to Customer as provided on any schedule to this Agreement.

    1.8 "PHI" shall mean Protected Health Information, as defined in 45 CFR § 160.103, but only to the extent such PHI that is received from Customer, or created or received by HCI on behalf of Customer.

    1.9 "Services" shall mean all customized web site development, consulting, training, research, decision support services, data management, support, maintenance, reporting, hosting services, subscriptions, professional services, and other services that HCI provides to Customer pursuant to this Agreement.

    1.10 "Software" shall mean the designated version of a computer software program that HCI licenses to Customer, or to which Customer has access pursuant to this Agreement, all updates for such program, and all documentation provided with such program.

    1.11 "Useable Data" shall mean complete, readable Customer Data, conforming to the source data standard set forth in any schedule, and including appropriate documentation, which has been tested and inspected by HCI, and determined to be Useable Data by HCI.

1

Rev. 01-23-2014

**2.** **HCI Products and Services.**

2.1     The parties shall sign agreed upon schedules to this Agreement, which set forth the Products and Services HCI will provide to Customer, and the prices and terms applicable to them.  To the extent the terms of a schedule conflict with the terms of this Agreement, the terms of the Agreement shall control unless otherwise expressly provided.  Customer shall have the right to receive only the specific Hosted Application specified on a signed schedule, and shall have no other rights or licenses to Products or Services (except as provided in any other signed agreement between Customer and HCI).

2.2     Except as  otherwise provided in this Agreement or a schedule, the following shall apply to Customer's use of the Hosted Application:

(a)  HCI hereby grants to Customer a nonexclusive, limited, non-transferable, non-assignable (except as provided in Section 15) license to use and access the Products in the United States, and the right to provide access to the Hosted Application to Authorized Users  in the United States, as more fully provided on the applicable schedule.  Customer may use the Hosted Application only as permitted in this Agreement, and for no other purposes.

(b)  Customer shall have no right to allow any person or entity that is not an Authorized User to access or use the Hosted Application directly or indirectly in any way.  Affiliates, Customer Clients and Customer Client Members shall have the right to access or Use the Hosted Application, but only so long as an Affiliate, Customer Client or Customer Client Member relationship exists.  The foregoing notwithstanding, this Agreement is entered into solely for the benefit of HCI and Customer.  No third party, Affiliate, Customer Client or Customer Client Member shall have the right to make any claim or assert any right under this Agreement, nor shall any third party, Affiliate, Customer Client or Customer Client Member be deemed a beneficiary of this Agreement.

(c)  In the event that HCI believes that an Affiliate or Customer Client is not in compliance with this Agreement, HCI agrees to seek damages for such claim against the Affiliate or Customer Client and may seek an injunction or other equitable relief directly against such Affiliate or Customer Client.  Customer shall not and shall not permit Authorized Users to (i) copy, reproduce, modify, create derivative works from, or excerpt any of the Products, (ii) distribute, rent, sublicense, share, transfer or lease the Hosted Application; (iii) attempt to reverse engineer or otherwise obtain copies of the source code for the Software; or (iv) attempt to de-encrypt or otherwise reverse engineer the Products in an attempt to obtain the identities of persons, payors, or providers.

(d)  If Customer obtains through HCI any software or data owned by third party vendors, the third party software or data will be subject to the terms and conditions of this Agreement.

2.2     Updates.  HCI shall furnish to Customer only the Product updates provided on an applicable schedule.  Customer agrees to permit installation of Minor Updates generally made available to HCI's accounts.  "Minor Updates" shall mean all modifications, updates, revisions and fixes to a Product that are required to maintain functionality as described in an existing schedule or generally made available to HCI's accounts at no additional cost.  Major Updates shall be installed at Customer's request and charged based on a "time and materials" basis or as otherwise mutually agreed by the parties.  "Major Updates" shall mean Customer-requested modifications, updates, revisions o Product to improve functionality as described in an existing schedule.  New Functionality shall be installed at Customer's request provided Customer agrees to pay increased fees for relevant Product, which fees shall be negotiated on a case-by-case basis and described in a subsequent schedule.  "New Functionality" shall mean the development of new functionality or new products or services not described on an existing schedule.

2.3     HCI Trademarks.  HCI grants to Customer a limited right to use designated trademarks of HCI, as provided on an applicable schedule, on marketing materials for the Hosted Application upon HCI's prior written approval of such materials.  Customer may use, and may grant Affiliates the right to use, the phrase "powered by HCI®" in an accurate and factual manner on websites or marketing materials relating to HCI Products or Services on

2

its website or marketing materials without prior approval. HCI represents and warrants that HCI owns or has a license to use HCI Trademarks.

2.4    Private Label Trademarks. Customer may, during the Term and upon notice to HCI, label the Products under Customer's own trademarks (the "Private Label Trademarks") as provided and in accordance with the applicable schedule. Customer may place the Private Label Trademarks on its website in a manner approved by HCI. Notwithstanding the foregoing, Customer may not remove or alter any HCI trademarks or any other trademarks, proprietary or intellectual property markings or notices that are affixed to or contained in the Hosted Application. Customer may not (a) place any markings or notices on the Hosted Application indicating or suggesting that Customer is the copyright owner of any portion of the Hosted Application; (b) use Private Label Trademarks that are substantially similar to or otherwise infringe upon any trademark of HCI or any third party; or (c) use Private Label Trademarks or other markings or notices in such a manner as to be likely to cause confusion or mistake as to the relationship between HCI and Customer as determined by Customer. Customer represents and warrants to HCI that Customer owns or has a license to use the Private Label Trademarks as provided in this Agreement.

3.    **Customer's Responsibilities.**

3.1    Customer will provide and maintain all computer hardware, software, and communications equipment necessary to use the Hosted Application, and to access the HCI Data and reports generated by the Hosted Application. If a schedule requires Customer to deliver Customer Data to HCI, Customer shall provide HCI with all Useable Data necessary for HCI to provide the Products or Services, in agreed upon formats. HCI will not be liable in the event that it is unable to provide the Products or Services under this Agreement because of Customer's failure to deliver Useable Data. Continuation of Products or Services may be contingent upon receipt of Useable Data.

3.2    Customer shall be responsible for its input data, for its data entry activities, and for the accuracy of the Customer Data. Customer agrees that the Customer Data it provides to HCI under this Agreement is true and accurate, to the best of Customer's knowledge. HCI shall not be responsible for errors in data input or edited by Customer or a third party on Customer's behalf, or for errors in the Hosted Application, if those HCI errors result from errors in data input or edited by Customer or a third party on Customer's behalf, or from Customer's failure to comply with this Agreement. Each party shall promptly notify the other party if it suspects or discovers any errors in input data. Customer is responsible for obtaining any permissions or releases necessary for the delivery of Customer Data to HCI.

3.3 Customer shall be responsible for client PHI in accordance to Section 9 Confidentiality and Section 10 HIPAA.

4.    **Ownership.**

4.1    The parties acknowledge that, as between HCI and Customer, Customer owns all Customer Data. Customer hereby grants to HCI a nonexclusive, limited, non-transferable, non-assignable (except as provided in Section 15) license to copy and store Customer Data onto HCI servers or other equipment as needed to fulfill its obligations under this Agreement, and the right to sublicense the foregoing to Affiliates. During the term of this Agreement, HCI may use, combine and transfer the Customer Data and information derived from Customer Data for HCI's own preparing of normative and benchmark data and databases, and for purposes of research and analysis. If applicable, after the term of this Agreement, HCI shall remove the identity of individuals and Customer information for HCI's own preparing of normative and benchmark data and databases, and for purposes of research and analysis. HCI shall not use, distribute or disclose Customer Data in any unauthorized manner that reveals the identity of Customer or an Authorized User, except as permitted by this Agreement or required by law.

3

4.2     The parties acknowledge that, as between HCI and Customer, HCI and its licensors own exclusively all right, title and interest in and to Products and Services, together with all modifications and derivative works thereof, and all related intellectual property rights.   Customer shall not at any time, directly or indirectly, challenge the scope, validity or ownership of HCI's rights in the Products and Services or do any act that could reasonably be expected to impair the scope, validity or ownership of such rights. Each party agrees to notify in writing the other party promptly upon gaining knowledge of any infringement, dilution or similar harm to the other party's intellectual property or information.

## 5.     Prices and Payment.

Customer shall pay to HCI the fees and expenses specified in the applicable schedules. Payment terms are thirty (30) days calculated from the date of receipt of each invoice.    Interest shall accrue on any past due amounts under this Agreement at five percent (5%) per annum or the Consumer Index Price for   that year, whichever is lower.. Upon HCI determining that Customer is owed a credit of any kind, HCI shall, in its sole discretion, either itemize each such credit on a separate credit memo and submit the credit memo to Customer, or apply the outstanding credits to unpaid invoices. Customer shall be responsible for any taxes applicable to the Hosted Application, except for taxes based upon HCI's property or net income. If Customer wishes to have taxes included on an invoice, Customer must provide the relevant tax and amount owed to HCI.  Pricing may change upon renewal schedule and  prior written approval by Customer and will be updated based on new products, functions and services as described under section "2.3 Updates".  Pricing updates will be given to Customer as new or updated schedules for resale use.

## 6.     Representations, Warranties and Limitation of Warranties.

6.1     HCI represents and warrants to Customer that HCI has the right to license and provide access to the Hosted Application to Customer. HCI also warrants that the Hosted Application will perform in accordance with its user documentation. If the Hosted Application fails to perform in accordance with the documentation, Customer shall notify HCI in writing, and HCI will respond to Customer in writing of their agreement and HCI shall repair or replace the applicable portion of the Hosted Application at no charge to Customer and coordinate the implementation of the correction with the Customer. This warranty is void if Customer (a) modifies the Hosted Application (other than as directed by HCI), (b) uses the Hosted Application in any manner which is not allowed under this Agreement, or (c) allows unauthorized persons to use the Hosted Application.

Except as expressly provided in this Agreement, THE HOSTED APPLICATION IS PROVIDED ON AN "AS IS" AND "AS AVAILABLE" BASIS. HCI DOES NOT MAKE AND EXPRESSLY DISCLAIMS ANY AND ALL WARRANTIES AND DUTIES, EXPRESS OR IMPLIED, RESPECTING THE HOSTED APPLICATION, INCLUDING ALL IMPLIED WARRANTIES OF MERCHANTABILITY, INFRINGEMENT AND FITNESS FOR A PARTICULAR PURPOSE.

## 7.     Service Level Agreements and Service Level Remedies.

7.1     **Service Levels.** At all times during the Term, the availability of the Healthspace Cloud™and the services provided by HCI in connection with the Healthspace Cloud™ under this Agreement shall meet or exceed the applicable Service Level Agreements described in Schedule B.

7.2     **Service Level Remedies.** HCI recognizes that its failure to attain and maintain any Service Level specified in Schedule B may have a material adverse impact on the business operations of Customer and that the damages from HCI's failure to attain and maintain the Service Levels are not susceptible of precise determination. Accordingly, if HCI fails to attain or maintain any Service Level, then (a) with respect to any failure which is not a Major Service Level Breach, Customer shall be entitled to the Service Level Credits specified in Schedule C , and (b) with respect to any failure which is a Major Service Level Breach, Customer shall be entitled to the remedies specified in Schedule C.

4

## 8.    Limitation of Liability and Indemnification.

8.1    Neither party, nor the vendors of products embedded in the Hosted Application, will be liable for any indirect, incidental, special or consequential damages (including lost profits, savings, sales, data or business) arising out of this Agreement, even if a party has been advised of the possibility of such damages These limitations shall not apply to obligations under Sections 8.2, 8.3, Schedule D or Schedule E of this Agreement.  HCI is not liable for medical or health care or insurance decisions made by any user of the Hosted Application.

8.2    HCI agrees to defend Customer against and hold it harmless from all claims, proceedings, damages, liabilities, and costs, including reasonable attorneys' fees, arising out of (a) a third-party claim that any Products owned by HCI infringe a United States copyright, trademark, or patent; (b) HCI's failure to perform under this Agreement including HCI's affiliates or (c) a breach by HCI of this Agreement.  Customer agrees to defend HCI against and hold it harmless from all claims, proceedings, damages, liabilities, and costs, including reasonable attorneys' fees, arising out of (a) HCI's authorized access to or use of the Customer Data; (b) a breach by Customer of this Agreement; or (c) the use of a Private Label Trademark, in a way contrary to the permitted use identified in section 2.5, to the extent such liability would not have arisen in the absence of the private label trademark.

8.3    In each case, the indemnified party agrees to give the indemnifying party prompt, written notice of any such claim, , and all reasonable assistance to defend such claim.  The indemnifying party will not settle a claim that involves a remedy other than monetary damages without the consent of the indemnified party, such consent shall not be unreasonably withheld or delayed.  The indemnified party shall not agree to settle the claim without the indemnifying party's written consent, provided that such consent is not unreasonably withheld, conditioned or delayed.  The indemnifying party shall have no obligations under this paragraph if such claims, damages and liabilities result from the indemnified party's material breach of this Agreement or Customer's unauthorized use of or modifications to the Hosted Application.  This provision shall not be deemed to waive or limit any other rights.

## 9.    Confidentiality.

HCI and Customer acknowledge that in the course of performance of their obligations under this Agreement, a party may be supplied with confidential and proprietary information of the other party concerning its business affairs, property, methods of operation, processing systems or other information and hereby agree that the terms of that certain Confidentiality Agreement entered into  and between HCI and Customer as of October 1, 2013 ("Confidentiality Agreement") shall govern the parties' responsibilities under this Agreement with respect to confidentiality.  The Confidentiality Agreement is attached hereto and expressly incorporated into this Agreement as Schedule F.

## 10.    HIPAA Compliance.

The parties acknowledge that the Health Insurance Portability and Accountability Act of 1996 and regulations thereunder, as amended from time to time, (collectively, "HIPAA") may govern certain protected health information ("PHI") (as defined in 45 C.F.R. § 160.103) maintained or transferred hereunder.  As such, the disclosure and use of PHI shall be governed by the terms and conditions of the Business Associate Addendum that the Parties entered into as of January 27, 2014 ("Business Associate Addendum"), which is attached hereto and expressly incorporated herein as Schedule D.  The terms and conditions of this Section 10 and the Business Associate Addendum are separate from, and in addition to, the confidentiality requirements set forth in Section 9 above.

5

## 11.    **Term and Termination.**

11.1    Unless earlier terminated pursuant to the terms of this Agreement, the initial term of this Agreement shall commence on the Effective Date and shall terminate on the third ($^{3rd}$) anniversary of the Effective Date (the "**Initial Term**"). Unless either Party provides written notice of termination of this Agreement to the other Party at least sixty (60) days prior to the end of the Initial Term or the then-current Renewal Term this Agreement shall automatically  be renewed for consecutive one (1) year terms  with notice being provided to the Customer 90 days in advance of renewal date (the "**Renewal Terms**") except that individual schedules terminate in accordance with the term therein. Upon termination or expiration (without renewal) of this Agreement, (a) each party will return to the other party or certify as destroyed all tangible items containing any of the other party's Confidential Information that are held by that party or its employees, agents, contractors or Affiliates, other than an archival copy of such or such copies as are necessary to exercise rights granted under this Agreement or obligations imposed by applicable law; and (b) Customer shall return all copies of all Products and related copyright materials to HCI, or destroy same and provide certification to HCI of the destruction of such Products and materials, within thirty (30) days after termination of this Agreement or the applicable Schedule.

11.2    Either party may terminate this Agreement at any time upon written notice if the other party files a petition in bankruptcy or is adjudicated bankrupt or insolvent, or makes an assignment for the benefit of creditors, or an arrangement pursuant to any bankruptcy law, or discontinues its business or if a receiver is appointed and such receiver is not discharged within thirty (30) days. Either party may terminate this Agreement immediately upon written notice to the other party following a judgment of a governmental authority or court or change in any laws and regulations, including a change in interpretation or enforcement of existing laws and regulations) that would make performance of this Agreement unlawful.

11.4    Either party may terminate this Agreement or any applicable SOW or schedule, or any portion thereof, upon one-hundred and twenty (120) days' prior written notice without penalty at any time after the effective date of this Agreement. At Customer's option, HCI shall provide Customer with all works-in-progress, Work Products and Deliverables for which Customer has paid through the date of termination.

11.5    Upon termination of this Agreement, notwithstanding anything to the contrary herein, all amounts due to HCI will be detailed on a final invoice and forwarded to Customer and undisputed amounts shall be paid within thirty (30) days of the receipt of final invoice.

## 12.    **Insurance.** HCI agrees, at its expense and during the term of the Agreement, to procure and maintain at minimum the following insurance with insurance companies that have an A.M. Best rating of at least A.   Upon Customer's request, HCI shall furnish a Certificate of Insurance evidencing the required insurance.

(a) Workers' Compensation.   Workers' compensation insurance sufficient to meet statutory liability limits in the state wherein the work is to be performed and employer's liability insurance with minimum limits of $100,000 each accident for bodily injury by accident and $100,000 each employee for bodily injury or disease.

(b) General Liability.    Commercial general liability insurance with coverage on a primary, non-contributing, occurrence basis.   The minimum limit for bodily injury and property damage shall be $1,000,000 each occurrence, $2,000,000 aggregate.

(c) Automobile.   Commercial automobile liability insurance covering all owned, non-owned or leased automobiles to be used by HCI in furtherance of the work with a minimum limit of $1,000,000 each accident for bodily injury and property damage.

(d) Professional liability insurance of $1,000,000 per incident and in the aggregate.

(e) Cyber insurance of $1,000,000 per incident and in the aggregate, including information security coverage.

6

13.     **Compliance with Laws.** Each party shall comply with all applicable federal, state and local laws and regulations.  Neither Customer nor HCI shall take or fail to take any action that would knowingly cause the other party to be in violation of any statue, law, rule or regulation.

14.     **Force Majeure.** Neither party shall be liable or deemed to be in default for any delay or failure in performance of any obligation under the Agreement or interruption of service resulting directly or indirectly from acts of God, civil or military authority, acts of the public enemy, acts of terrorism, war, riots, civil disturbances, insurrections, , labor disputes, fire, explosions, earthquakes, or floods..  If a delay continues for a period of more than five (5) days, either party may immediately terminate the Agreement or an affected SOW upon written notice to the other party.

15.     **Assignment.** Neither party may assign its rights or delegate its obligations under the Agreement without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed. HCI may utilize subcontractor(s) in providing Services pursuant to this Agreement.  Notwithstanding the foregoing, either party may assign its rights and obligations under the Agreement to a parent or Affiliate or as part of a corporate reorganization, consolidation, merger or sale of all or substantially all of its assets and such assignment will be effective without the consent of the other party, provided that the successor agrees in writing to assume all of the assigning party's obligations hereunder and has adequate resources to meet its obligations hereunder, and further provided, in the case of Customer, that Customer's successor is not an existing client or customer of HCI, and further provided, in the case of HCI, that HCI's successor is not a competitor of Customer.  Any attempted assignment not in accordance with this Section shall be null and void.  This Agreement and all of its provisions shall be binding upon and inure to the benefit of the parties and their respective permitted successors and assigns.

16.     **General.**

16.1     Entire Agreement; Amendment.  This Agreement, together with any applicable schedules, exhibits, and statements of work, constitutes the entire agreement between the parties and supersedes all prior proposals, communications and agreements, including any executed confidentiality agreement, between the parties relating to the subject matter of this Agreement.  No amendment, change, or waiver of any provision of this Agreement will be binding unless in writing and signed by both parties.  In the event one or more of the provisions of this Agreement are found to be invalid, illegal or unenforceable by a court with jurisdiction, the remaining provisions shall continue in full force and effect.  No delay or omission in the exercise by either party of any right under this Agreement shall impair any such right or be construed to be a waiver thereof. If any provision or provisions of this Agreement shall be held to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

16.2     Survival.  The following provisions shall survive termination of this Agreement or the applicable schedule: Sections 4, 7, 8, 9, 10 and 13, and any provision contained in a schedule that would by its nature survive termination of the schedule or this Agreement.

16.3     Relationship of the parties.  HCI's relationship to Customer is that of an independent contractor. Neither party shall be deemed to be or hold itself out as a partner, agent, employee or joint venture partner of the other party.

16.4     Notices.  Any notices of termination relating to this Agreement shall be in writing and will be sent by certified United States mail, postage prepaid, return receipt requested, or by facsimile transmission or overnight courier service, addressed to the parties at the addresses set forth below:

Rev. 01-23-2014

HCI MASTER LICENSE AGREEMENT

If to HCI:

> Healthcare Interactive, Inc.
> 3060 Route 97, Suite 260
> Glenwood, Maryland 21738
> Attention: _____

If to Customer:

> POMCO, Inc.
> 2425 James Street
> Syracuse, NY 13206
> Attention: Jeff Winchell

With a copy to:

Either party may, by written notice given in conformity with this Section, designate a different address or addresses to which such notices shall be sent. Notices given: (i) if delivered personally, upon delivery thereof; or (ii) if delivered by nationally recognized overnight carrier, the day after the notice is deposited with the carrier; or (iii) if mailed by certified mail, return receipt requested, upon the third day after the notice is mailed.

17.5     Governing Law; Venue.  This Agreement shall be governed in all respects by and construed in accordance with the laws of the State of Delaware without regard to conflict of law principles

17.6     Severability.  It is the desire and intent of both parties hereto that the provisions of this Agreement shall be enforced to the fullest extent permissible under the laws, regulations, and public policies applied in each jurisdiction in which enforcement may be sought.  If any provision in this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions will nevertheless continue in full force without being impaired or invalidated in any way.

17.7     Section Headings.  The section headings contained in this Agreement are included for reference only and shall not affect the construction or interpretation of any term in this Agreement.

17.8     Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  For purposes hereof, a facsimile copy of the Agreement, including the signature pages hereto, shall be deemed to be an original.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date set forth above.

Healthcare Interactive, Inc.

BY: _____

NAME: HENRY CHA

TITLE: CEO & PRESIDENT

DATE: 3/16/14

Customer

BY: _____

NAME: ROBERT W. POMFREY

TITLE: C.E.O.

DATE: 1/29/14

8

HCI MASTER LICENSE AGREEMENT

Rev. 01-23-2014

HCI MASTER LICENSE AGREEMENT

## Schedule A – POPULATION HEALTH MANAGEMENT OUTSOURCE

# HCI Pricing

**1.  Healthspace Cloud Provisioning and Set Up**                    $10,000

**2.  Population Health Management**                    Addendum A
                                                        (v20131210)

All Pricing for PHM Full Outsource is included in "Pomco Pricing Revision Addendum A v20131210.xlsx" as defined in tabs "PHM-Full Service" and "PHM Labs."

Pricing is set for a minimum of 15,000 EEs within 6 months under contract as of June 1, 2014.

**3.  Data Storage and Archiving**                    Addendum A
                                                      (v20131210)

PEPM rate in Schedule A includes seven (7) plan years of member data.

Data Storage is defined as additional three years of member data in the production system over the 7 plan years of member data.

Archiving is defined as storage of member data in non-production systems with limited reporting access.

**4.  Auto-Invoicing**

HCI will automatically invoice Customer for each account that is accessing services on the Customer Healthspace  Cloud provided by HCI. Invoices will be generated on or about the 1st of the month.

1.  Customer agrees to sell the Population Health Management Program at the minimum retail pricing as indicated in the document, POMCO Pricing Addendum A v20131210.  Minimum retail pricing is the pricing that has been set as the lowest price used to be sold to a client of the Customer, unless approved by an authorized HCI representative.

2.  Customer agrees to publish retail pricing at the minimum retail pricing or higher.

3.  HCI agrees to pay the Customer the difference between the price sold to the customer at the minimum retail pricing or higher and the whole sale pricing as described in pricing documents given to Customer, as a "marketing fee" for the resale of the Population Health Management program.

4.  Customer also agrees to keep confidential the wholesale pricing of the Population Health Management program.

5.  HCI agrees to maintain the scheduled pricing for each calendar year.  HCI also agrees to notify pricing changes before October 1 for any new pricing goes into effect for the next calendar year.  Prices already quoted during the sales prices will be honored for the next year.  Pricing changes will be agreed upon by both parties before going into effect.

Rev. 01-23-2014

HCI MASTER LICENSE AGREEMENT

IN WITNESS WHEREOF, the undersigned have executed Schedule A.

**CUSTOMER**                                    **Healthcare Interactive, Inc.**

By: _____          By: _____

Title: _____C.E.O._____        Title: ___President_____

Print Name: _ROBERT W. POMFREY_         Print Name: _Henry Cha_____

Date: _____1/29/14_____        Date: _____1/29/14_____

Rev. 01-23-2014

Schedule B – Healthspace Cloud Licensing

## Pricing

**Base Product Licensing**

0.  **Eligibility Data Warehouse - !Pomco Replacement**
    **Application(s):** P2Padmin, Client Portal
    **Brief Description:** Housing of eligibility data, plan information
    **Set-up:** $15,000
    **Pricing:** PEPM Cost is determined by the total number of employee equivalents (EEs) that are active in the system during the billing month.  This licensing cost is required and must be added to any Add-On Functional Capabilities or Data Storage services.

| EE Count | Cost |
|---|---|
| **180,000+** | $0.10 PEPM |

**Add-On Functional Capabilities**

1.  **a. Member Enrollment – Standard**
    **Application(s):** P2Padmin, P2Pme (Member Portal)
    **Brief Description:** Includes some or all of the following benefits: Medical, Rx, Dental, Vision, Flex, HRA, HSA
    **Set-up:** $12,000
    **Pricing:** Fixed tier and PEPM costs are determined by the total number of employee equivalents (EEs) that are active in the system during the billing month, using this service. Tier pricing is incremental, so if there are 52,000 EEs, the per month cost would be ($0.40*10,000 + $0.35*40,000+$0.25*2,000).

| EE Count | PEPM Cost |
|---|---|
| **1-10,000** | $0.40 |
| **10,001-50,000** | $0.35 |
| **50,001-100,000** | $0.25 |
| **100,001-200,000** | $0.20 |
| **200,001+** | $0.10 |

1.  **b. Member Enrollment - Extended**
    **Application(s):** P2Padmin, P2Pme (Member Portal)
    **Brief Description:** Includes some or all of the Standard benefits, plus one or more of Voluntary /Company Paid Life, Short / Long Term Disability, Statutory Disability, or any other non-Standard benefit.  An example would be Canton Potsdam Hospital client.
    **Set-up:** $12,000 (any additional custom development will be agreed upon on a per project basis)
    **Pricing:** Fixed tier and PEPM costs are determined by the total number of employee equivalents (EEs) that are active in the system during the billing month, using this service. Tier pricing is incremental, so if there are 52,000 EEs, the per month cost would be ($0.60*10,000 + $0.50*40,000+$0.40*2,000).

| EE Count | PEPM Cost |
|---|---|
| **1-10,000** | $0.60 |

| | |
|---|---|
| **10,001-50,000** | $0.50 |
| **50,001-100,000** | $0.40 |
| **100,001-200,000** | $0.30 |
| **200,001+** | $0.20 |

2. **a. Claims Data Warehouse**
   **Application(s):** P2Padmin
   **Brief Description:** Claims maintained in P2Padmin associated with member principals.
   **Set-up:** $2,500
   **Pricing:** PEPM costs are determined by the total number of employee equivalents (EEs) that are active in the system during the billing month, using this service.  New layout mapping and data feed setups are addressed in the Additional Fees section.

| EE Count | PEPM Cost |
|---|---|
| **1+** | $0.18 PEPM |

2. **b. Claims Warehouse with Member Portal**
   **Application(s):** P2Padmin, P2Pme (Member Portal)
   **Brief Description:** Member portal with eligibility info, claims, customer service, doc library, account mgmt.
   **Set-up:** $3,000
   **Pricing:** Fixed tier and PEPM costs are determined by the total number of employee equivalents (EEs) that are active in the system during the billing month, using this service.

| EE Count | PEPM Cost |
|---|---|
| **1+** | $0.20 PEPM |

3. **Add Predictive (Risk) Modeling**
   **Application(s):** P2Padmin, P2Pme (Member Portal)
   **Brief Description:** Includes licensing, data processing, and reporting using Johns Hopkins ACG Modeler
   **Pricing:** Fixed tier and PEPM costs are determined by the total number of employee equivalents (EEs) that are active in the system during the billing month, using this service.

| EE Count | PEPM Cost |
|---|---|
| **1+** | $0.25 PEPM |

4. **a. Reporting Data Warehouse**
   **Application(s):** Reporting Data Warehouse
   **Brief Description:** Select data maintained in a separate reporting data warehouse.
   **Set-up:** $2,500.00
   **Pricing:** Pricing provided below is for a configuration on Azure with the following minimum requirements, which may be upgraded at additional cost: SQL Server Standard A5 (2 x 1.6 GHz, 14GB RAM), 1 TB storage, 100 GB/month bandwidth

| Item | Cost |
|---|---|
| **Azure SQL Server Standard A5** | $654.72 per month |
| **Storage 1TB** | $94.63 per month |

**Bandwidth 100 GB/mo**          $12.00 per month
**Blocks of 50 data tables**     $100.00 per month

4. **b. Developer Access to Reporting Data Warehouse**
   **Application(s):** Reporting Data Warehouse
   **Brief Description:** Developer / Data Base Administrator access to the reporting data warehouse, using Microsoft SQL Reporting Services.
   **Pricing:** No additional charge at this time for client access license (CAL) fees as this is currently included in the Microsoft Azure SQL Server licensing.

5. **Workflow Engine Administrative User Access**
   **Application(s):** P2Padmin / Manage / Workflow Templates, Project Types, and Extensions
   **Brief Description:** Admin configuration access to build/edit workflows for use in P2Padmin, P2Pme. Allows for business process engineering, operational workflows, custom interactive member workflows. Includes unlimited named user access, plus support, but does not include full consultative business process re-engineering through workflow template building and configuration.
   **Pricing:** $10,000 per year. Pricing for HCI builds of custom workflows and business process engineering will be on a per project basis.

**Data Storage**

1. **Data Storage – Extended beyond 7 years**
   **Application(s):** P2Padmin
   **Brief Description:** Maintenance of and access to historical data, over 7 years old, within P2Padmin, for an additional 3 years.
   **Pricing:** Fixed tier and PEPM costs are determined by the total number of employee equivalents (EEs) that are active in the system during the billing month, using this service.

   | EE Count | PEPM Cost |
   |----------|-----------|
   | 1+       | $0.07 PEPM |

2. **Data Storage – Archived historical data**
   **Application(s):** P2Padmin
   **Brief Description:** Maintenance of historical data, over 7 years old, with raw data access upon request.
   **Pricing:** Fixed tier and PEPM costs are determined by the total number of employee equivalents (EEs) that are active in the system during the billing month, using this service.

   | EE Count | PEPM Cost |
   |----------|-----------|
   | 1+       | $0.05 PEPM |

HCI MASTER LICENSE AGREEMENT

**Additional Services**

The following services are billed on an as-incurred or as-needed basis and are not included in the implementation fees and/or PEPM fees listed above.

| Service | Description | Fee |
|---|---|---|
| **ETL - Data Management** | | |
| **Mapping for new layout** | HCI to map new 834/837 or flat file layout (not Basic, TN, SU, HRI). These are one-time fees for mapping a new layout.  If a mapping already exists and will be re-used, there is no charge. | $250 per mapping for up to 15 fields in a layout<br>$500 per mapping for 16 - 40 fields in a layout<br>$700 per mapping for 41+ fields in a layout |
| **Inbound/Outbound file feed set-up, assuming existing mapping** | HCI to set-up a new in/outbound file feed, for a file with an existing mapping | $500 one time fee per custom file delivery method to/from a specific client or vendor |
| **Report Writing** | | |
| **Custom Report Writing** | HCI creation of custom reports using SQL reporting services | $150 per hour |
| **Training** | | |
| Online | Training sessions, topic to be determined on an as-needed basis. Implementation projects shall include online training sessions. | $125 / hr (after implementation) |
| Onsite | Training sessions, at client site, topic to be determined on an as-needed basis. | $750 / day |
| Travel | | Pass-through |
| **Plan Building** | | |
| **Plan build or Pre-dataload Review of Plans/Benefits** | HCI plan build or review and correction of a client's plans and benefits prior to data load.  Provide 5 business days for such a review to be completed. | $150 per client with 1 Plan and up to 3 Benefits<br>$350 per client with 2 to 3 Plans and up to 6 Benefits<br>$650 per client with 4 to 6 ~~or more~~ Plans and 7 to 10 ~~or more~~ Benefits<br>*Pricing to be determined on a case by case basis for clients with larger or more complex plan designs* |
| **Post-dataload Review of Plans/Benefits** | HCI review and correction of a client's plans and benefits after a failed data load, where the issue was errors in the configured plans and/or benefits.  Provide 5 business days for such a review to be completed. | $250 per client with 1 Plan and up to 3 Benefits<br>$450 per client with up to 3 Plans and up to 6 Benefits<br>$750 per client with 4 or more Plans and 7 or more Benefits |

HCI MASTER LICENSE AGREEMENT

**Projects**

Projects will be quoted on a per-project basis, to ensure that the pricing reflects the requirements, the statement of work, and deliverables.

**Auto-Invoicing**

HCI will automatically invoice Customer for each account that is accessing services on the Customer Cloud provided by HCI. Invoices will be generated no later than the 15th day of each month following the month of service.

IN WITNESS WHEREOF, the undersigned have executed Schedule B.

**CUSTOMER**

By: _____

Title: _____

Print Name: JEFF Winchell

Date: 9/9/14

**Healthcare Interactive, Inc.**

By: _____

Title: President

Print Name: Henry Cha

Date: 9/9/14

Rev. 9-03-2014    Page 5

## Schedule C-Service Level Agreement

This Service Level Agreement ("Schedule C") is an Addendum incorporated into the Master Agreement (the "Agreement") between ___Pomco, Inc.___ ("Customer") and Healthcare Interactive, Inc. (HCI).  Schedule C is governed by the terms of the Agreement, and to the extent of any conflict between this Schedule C and the Agreement, the terms of the Agreement shall govern.

All defined terms used in this Schedule C shall have the meanings ascribed to them in the Agreement.

1. Service Description

   HCI shall make the Service ("Healthspace Cloud™" and "Point to Point Healthcare (P2P)") available to Customer via a hosted web interface.

2. Service Level Warranty

   In the event that Customer experiences an "Interruption of Service", HCI will, upon Customer's request, extend Financial Adjustments as outlined in Schedule D.  Interruption of Service is defined as a verifiable which includes being reported by Customer  to HCI Support.   failure of all or part of the Healthspace Cloud Service and/or a total failure of access to HCI's Point to Point Healthcare, other than during scheduled maintenance, as a direct result of the failure of the hardware or software provided by HCI or used by HCI to provide software to the Customer.

   a)      Service Availability

   HCI guarantees system availability, as measured over the preceding month, to equal or exceed ninety-nine point -five percent (99.5%).

   b)      Warranty Limitation

   HCI warrants only that which is provided to Customer by or through HCI.  HCI does not warrant the availability of the Internet to Customer.

3. Customer Support Warranty

Customer is responsible for first level (end-user) support. HCI shall provide second-level technical and functional Customer Support to designated Customer Administrators in using the Service and hereby commits to provide an initial response within the specified hours based on Priority. In providing second-level technical and functional support, HCI will provide support, instruction, and training to all of Customer's Administrators, as designated by Customer in its sole discretion.  The Customer will be trained on the operation of the HCI Software and is expected to reasonably perform the following support:

- Determine if a user problem is related to local hardware, software, operating environment or user training.
- If a user problem is related to local hardware or software and there is an established work-around or resolution for the problem, communicate that work-around to the user.
- If a user problem is related to local hardware or software and the problem has not already been documented, document the problem in detail and escalate to HCI support.
- If the user problem is related to local operating environment, communicate the resolution.

15

Rev. 01-23-2014

- If the user problem is related to user training, provide user assistance to complete the task in question and provide additional training.

- Establish and maintain an inventory of resolutions as received from HCI.

Customer shall provide HCI with a list of the designated Administrators at the beginning of each renewal year. HCI Customer Support is staffed 8:30am-5:30pm EST M-F, (excluding holidays). Support requests should first be documented in a ticket, which is logged and automatically routed to HCI support staff. For telephone support, the number is 1-866-397-9731, where the client can reach their HCI Account Representative. At any time, the customer can review their logged problems and Service Requests from within P2Padmin HCI will include a session on documenting a ticket and P2Padmin in the training provided    For service outside of these regular business hours and days, HCI will provide an email address and mobile phone number to their HCI Account Representative to process customer support requests.

 HCI Customer Support will not take calls directly from non-designated Customer Administrative personnel utilizing the Healthspace Cloud™ applications or Third Parties which interface with the Healthspace Cloud™ applications, unless it is preceeded by a phone call from the Customer granting approval in advance of the non-designated Customer calling. In unique circumstances, and with approval from Customer , HCI Customer Support may contact Customer personnel to obtain specific information about a problem if this information can only be obtained through direct contact with the problem originator.

4.  **Service Request, Problem Reporting, Tracking and Resolution**

a)  Description of Problem Classifications. When the help desk receives a failure notice, it is evaluated for the purpose of classification. The classification of the failure determines the actions to be taken and the escalation path. A list of the HCI problem classifications is set forth below:

    I.    Priority 1:  All Healthspace Cloud™ applications users have a complete loss of System functionality and/or there  has been a major loss of Healthspace Cloud™ functionality or impairment of Healthspace Cloud™ users' ability to access the System. The problem will be corrected with an HCI Software emergency release.

    II.    Priority2: Some or all Healthspace Cloud™ users are unable to access some function but that function is either not critical or a work around has been established for it, or there are a minor number of users down, or software or data installations are required. These problems will be placed in subcategories relating to the schedule for their correction by HCI, as follows:
        i.   3.a–Problem scheduled for correction in the next HCI Software emergency release.
        ii.   3.b–Problem scheduled for correction in the next scheduled HCI Software release.
        iii.  3.c–Problem scheduled for correction in  a subsequent scheduled HCI Software release containing other changes to the relevant module(s).
    III.   Priority 3 All other problems.

Entering the Service Request into the Service Tracking system causes the Service Request to be recorded and a tracking number to be assigned.. Once entered into the tracking system and prioritized, the Service Request is assigned to the appropriate staff member for resolution. The assignment of Priority 3 subcategories will be made at HCI's next Service Request review meeting following the recording of the Service Request. The service call status and notable progress is reported regularly and will be shared with Customer.

b)  Problem Reporting, Tracking and Resolution Service Level Agreements

I.     Priority 1 problems will receive a call back within 60 minutes and a fix or workaround within 4 hours.  Priority 1 problems are any problems where the Service is inoperable in whole or part or the environment is down including down servers, down communications, down applications, etc. Customer should make every reasonable attempt to contact HCI via phone and/or email to expedite the communication of the problem.

HCI will assign the service call to an appropriate staff member within 60 minutes of a problem being reported during normal Customer Support hours, and within 120 minutes of a problem being outside normal Customer Support hours.

II.    Priority 2 problems will receive a call back within 2 hours and fix or workaround within 2 days Severity 2 problems are performance problems, backup problems and/or problems that affect the performance of the environment including software bugs, non-performance of daily backups, slow responses when accessing the applications, etc.

During normal Customer Support hours, HCI will assign the service call to an appropriate staff member within 120 minutes of a problem being. Outside normal Customer Support hours, HCI will assign the service call to an appropriate staff member within 240 minutes of a problem being reported.

III.   Priority 3 problems will receive a call back within 24 hours and fix or workaround within 7 days or next update/release whichever is sooner.  Severity 3 problems are operational issues or procedural problems or changes that do not affect performance including reports not delivered to Customer on time, off-site rotation of tapes not performed as scheduled, etc.

HCI will implement the problem resolution in the next HCI Software release indicated by the Priority 3 problem subcategory.

IV.    Customer Status Updates
The Customer will be provided periodic status updates based upon Priority level. Priority 1 Service Request status will be reported to Customer within one (1) hour of recording in the Service Request tracking system during Normal Support Desk Hours, or within two (2) hours if recorded in the Service Request tracking system outside Normal Customer Support Hours, and by mutual agreement thereafter until the Service Request is resolved.

Priority 2 problem status will be provided to Customer within 8 hours of the Service Request being recorded in the Service Request tracking system during Normal Support Desk Hours and daily thereafter until the Service Request is resolved.

Priority 3 problem status will be provided to Customer within 12 hours of being recording in the Service Request tracking system during Normal Customer Support Hours and the status updated weekly thereafter until the Service Request is resolved. Priority 4 Service Request status will be reported at Service Request review meetings.

All fixes or workarounds must be agreed to by Customer.  Once a fix or workaround is in place, HCI must work diligently and continuously toward permanent correction of the problem according to the defined SLA.


5.  Service Warranty and Service Level Agreements

HCI shall provide online access by Customer users to the Healthspace Cloud™ platform. The Healthspace Cloud™ Scheduled Hours of Operation shall be 24 hours per day, 7 days per week, excluding periods of Maintenance Downtime and periods of Unscheduled Outages outside the control of HCI. The Healthspace Cloud™ will be considered available when the Healthspace Cloud™ is accessible at the point where HCI's ISP interfaces to the Internet and is operating substantially according to its specifications.

Service Availability is measured on each of the following platforms platforms:

- Healthspace Cloud™ – The computing platform that operates the end user software, Point to Point Healthcare;
- Point to Point Healthcare™-The software application available to end users, including:
  - P2Padmin
  - P2Par
  - P2Pme
  - P2Pmd

The Service Level Agreements are effective the first day of the month following the date which is thirty (30) days after the Access Date:

5.1 Healthspace Cloud™ Scheduled Hours of Operation Availability Service Level Agreement

**Service Availability:** 99.5% during Scheduled Hours of Operation.
**Measurement:** Healthspace Cloud™ availability will be measured as a percentage of the total number of Scheduled Hours of Operation during a month that the Healthspace Cloud™ is actually available to Customer personnel.  Availability will be calculated on a monthly basis as follows: (i) total Scheduled Hours of Operation for the month *less* Maintenance Downtime occurring during Scheduled Hours ofOperation, expressed in minutes, *divided by* (ii) total Scheduled Hours of Operation for the month *less* Unscheduled Outages outside the control of HCI occurring during Scheduled Hours of Operation, expressed in minutes.

- The duration of each Unscheduled Outage during Scheduled Hours of Operation will be measured as the amount of time during the Scheduled Hours of Operation beginning with the earlier of the time HCI detected or was otherwise made aware of the outage or the time Customer notified HCI of the outage and ending with a notification to the Customer Help Desk via email that the HCI Healthcare Management System Software is again accessible.

- Unscheduled Outages resulting from a software failure within the first thirty (30) days of the production implementation of a non-patch release of such software are excluded from this availability computation.

5.2 Point to Point (P2P) Healthcare Scheduled Hours of Operation Software Availability Service Level Agreement

**Service Availability:** 99.5% during Scheduled Hours of Operation.
**Measurement:** P2P Availability will be measured as a percentage of the total number of Scheduled Hours of Operation during a month that the P2P software is actually available to Customer personnel. Availability will be calculated on a monthly basis as follows: (i) total Scheduled Hours of Operation for the month *less* Maintenance Downtime occurring during Scheduled Hours of Operation applicable to P2P *less* Unscheduled Outages of the P2P occurring during Scheduled Hours of Operation, expressed in minutes, *divided by* (ii) total Scheduled Hours of Operation for the month *less* Unscheduled Outages outside the control of HCI occurring during Scheduled Hours of Operation, expressed in minutes.

18

Rev. 01-23-2014

- The duration of each Unscheduled Outage during Scheduled Hours of Operation will be measured as the amount of time during the Scheduled Hours of Operation beginning with the earlier of the time HCI detected or was otherwise made aware of the outage or the time Customer notified HCI of the outage and ending with a notification to the Customer via email that the P2P software is again accessible.
- Unscheduled Outages resulting from a software failure within the first thirty (30) days of the production implementation of a non-patch release of such software are excluded from this availability computation.
- Time that the P2P application is not available resulting from lack of availability of the Healthspace Cloud™ will be deducted from the Scheduled Hours of Operation for purposes of this calculation.

5.3  System Upgrades and Maintenance

a) Scheduled Maintenance.  Scheduled maintenance that is expected to result in the Service being unavailable.
b) Unscheduled Maintenance.  Any maintenance that is considered by HCI to be an emergency may occur at any time.
c) Notification of Scheduled Maintenance.  HCI will notify Customer of scheduled maintenance at least five days prior to performing such maintenance.
d) Notification of Unscheduled Maintenance.  HCI will notify Customer of any unscheduled maintenance as early as possible.  Notification will be provided no later than 1 hour (60) minutes prior to such maintenance.
e) Notification of Upgrade.  HCI will notify Customer of any major release at least seven (7) days prior to such release.
f) Method of Notification.  All notifications required under this Section 5 will be made via electronic mail to the e-mail address designated by Customer.  E-mail must be followed by personal contact – either a responsive e-mail from a person (not automatic generation by a machine)' or a telephone call with a person.

6.  Data Backup and Recovery and Off-site Storage

Backup files are created and maintained solely for the purpose of restoring the system to an operational state, if required.

Databases are backed up to redundant disk arrays on a schedule determined the criticality of the database's function using a discreet automated job engine.  Backups are then uploaded to a secondary redundant disk array for full hardware redundancy.

a. Schedules
c) Databases that are critical to Client functionality have the following backup schedule
   I.   Transaction logs as are backed every other hour and retained for 7 days
   II.  A full backup occurs daily and is retained for 1 week
   III. A full backup occurs daily and is retained for  1 month
   IV.  A full backup occurs monthly and is archived permanently

d) Databases that are subcritical are backed up on the following schedule.
   I.   A differential backup is performed daily and retained for two weeks
   II.  A  full backup is performed  weekly and retained for 6 month

e) Recovery

Rev. 01-23-2014

HCI MASTER LICENSE AGREEMENT

I.    Databases can be restored directly from either the first copy or the secondary hardware copy directly to the new database server.

II.    Files are backed up to redundant disk arrays every 6 hours and retained for 30 days

III.    Virtualized servers have their virtual hard drives (VHDs) copied before and after each major change to their applications and operating systems.  These copies are archived on redundant disk arrays for full hardware redundancy.  VHDs are accessible from a pool of redundant hosts all of which are viable hosts for all VMs.

IV.    Mail is archived every 45 minutes and retained for 30 days on redundant disk arrays.

7.  Exclusions. HCI's service level commitments under this Addendum D shall not extend to any performance or availability issues:

a.    Force Majeure.  HCI shall be not be liable or deemed to be in default for any delay or failure in performance of any obligation under the Agreement or interruption of service directly or indirectly from acts of God, civil or military authority, acts of the public enemy, acts of terrorism, war, riots, civil disturbances, insurrections, labor disputes, fire, explosions, earthquakes, floods.  .  If a delay continues for a period of more than five (5), either party may immediately terminate the Agreement or an affected SOW upon written notice to the other party.

b.    Attributable to the acts or omissions of Customer or Customer's employees, agents, contractors, or vendors, or anyone gaining access to HCI's Service by means of Customer's passwords or equipment and are due solely to the negligence of Customer.

c.    Due to malicious or grossly negligent acts by Customer's employees that cause material damage to the Service of otherwise materially degrade the performance of the Service

d.    Service-related performance or accessibility problems caused predominantly by intentional acts of Customer's employees in derogation of express instructions from HCI concerning the use of or access to the Service

e.    That resulted from actions or inactions of Customer or third parties assigned by customer

f.    Failure or interruptions via internet or telecom services up to the point of HCI's data center

20

Rev. 01-23-2014

## Schedule D

### Service Level Remedies and Breach

If HCI fails to meet the Service Level Agreement Targets set out in Schedule C, financial adjustments will be made to the monthly Healthspace Cloud™ Subscription Fees indicated below. Customer may declare a Major Service Level Breach and terminate the Agreement if monthly Scheduled Hours of Operation Server Availability falls below 97% during any consecutive three (3) month period.

No financial adjustments will be made nor do breach conditions apply if and to the extent that the failure to meet Service Level Agreement targets is caused by a Force Majeure Event or failure of Customer to perform its obligations under this Agreement.

1. Service Level Remedies

| Scheduled Hours of Operation Monthly Availability | Service Level Credit |
|---|---|
| 99.5%-100% | No Adjustment |
| 99%-99.49% | 5% Credit on Monthly Healthspace Cloud™ Access Fee |
| 98%-98.99% | 10% Credit on Monthly Healthspace Cloud™ Access Fee |
| 97%-97.99 | 15% Credit on Monthly Healthspace Cloud™ Access Fee |
| <97% | 20% Credit on Monthly Healthspace Cloud™ Access Fee |

21

Rev. 01-23-2014

SCHEDULE E -

**ADDENDUM TO AGREEMENT WITH BUSINESS ASSOCIATE**

This addendum ("Addendum") is effective as of the 27 day of January, 2014 ("Effective Date"), and amends and is made part of, a Master Agreement ("Agreement") dated as of January 27, 2014, by and between Healthcare Interactive, Inc. ("Business Associate") and POMCO, Inc. ("Company").

Company and Business Associate modify Agreement to incorporate the terms of this Addendum to comply with requirements of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and regulations promulgated thereunder (45 C.F.R. Parts 160-164) as well as applicable provisions of the Health Information Technology for Economic and Clinical Health ("HITECH") Act, as incorporated in the American Recovery and Reinvestment Act of 2009 (H.R. 1, "ARRA") and any implementing regulations promulgated thereunder. Company and Business Associate agree to incorporate into this Addendum any regulations issued with respect to the HITECH Act that relate to the obligations of business associates. Business Associate recognizes and agrees that it is obligated by law to meet the applicable provisions of the HITECH Act.

**A.     Privacy of Protected Health Information.**

**1.     Permitted Uses and Disclosures.** Business Associate is permitted to use and disclose Protected Health Information that it creates or receives on Company's behalf or received from Company (or another business associate of Company) and to request Protected Health Information on Company's behalf (collectively, "Company's Protected Health Information") only as follows:

**a)     Functions and Activities on Company's Behalf.** To perform functions, activities, and services on behalf of Company as specified in Agreement.

**b)     Business Associate's Operations.** For Business Associate's proper management and administration or to carry out Business Associate's legal responsibilities, provided that, with respect to disclosure of Company's Protected Health Information, either:

**(i)**     The disclosure is Required by Law; or

**(ii)**     Business Associate obtains reasonable assurance, evidenced by written contract, from any person or entity to which Business Associate will disclose Company's Protected Health Information that the person or entity will:

a.     Hold Company's Protected Health Information in confidence and use or further disclose Company's Protected Health Information only for the purpose for which Business Associate disclosed Company's Protected Health Information to the person or entity or as Required by Law; and

b.     Promptly notify Business Associate (who will in turn notify Company in accordance with Section D(1) of this Addendum) of any instance of which the person or entity becomes aware in which the confidentiality of Company's Protected Health Information was breached.

**c)     Valid Authorization.** Business Associate may use and disclose Protected Health Information to the extent allowable under a valid authorization from the individual who is the subject of the Protected Health Information.

22

Rev. 01-23-2014

**d)** **Minimum Necessary.** Business Associate will, in its performance of the functions, activities, services, and operations specified in Section A(1) above, make reasonable efforts to use, to disclose, and to request of a Covered Entity only the minimum amount of Protected Health Information reasonably necessary to accomplish the intended purpose of the use, disclosure or request, except that Business Associate will not be obligated to comply with this minimum necessary limitation with respect to:

**(i)** Disclosure to or request by a health care provider for Treatment;

**(ii)** Use with or disclosure to an individual who is the subject of Company's Protected Health Information, or that individual's personal representative;

**(iii)** Use or disclosure made pursuant to an authorization compliant with 45 C.F.R. § 164.508 that is signed by an individual who is the subject of Company's Protected Health Information to be used or disclosed, or by that individual's personal representative;

**(iv)** Disclosure to the United States Department of Health and Human Services ("DHHS") in accordance with Section E(1) of this Addendum;

**(v)** Use or disclosure that is Required by Law; or

**(vi)** Any other use or disclosure that is excepted from the minimum necessary limitation as specified in 45 C.F.R. § 164.502(b)(2).

**2.** **Prohibition on Unauthorized Use or Disclosure.** Business Associate will neither use nor disclose Company's Protected Health Information except as permitted or required by this Addendum or in writing by Company or as Required by Law. This Addendum does not authorize Business Associate to use or disclose Company's Protected Health Information in a manner that will violate 45 C.F.R. Part 164, Subpart E "Privacy of Individually Identifiable Health Information" if done by Company, except as set forth in Section A(1)(b).

**3.** **Security of Organization's Electronic Protected Health Information.** Business Associate will develop, implement, maintain, and use administrative, technical, and physical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of Electronic Protected Health Information (as defined in 45 CFR 160.103) that Business Associate creates, receives, maintains, or transmits on Covered Entity's behalf as required by the Security Rule, 45 CFR Part 164, Subpart C and as required by the HITECH Act. Business Associate also shall develop and implement policies and procedures and meet the Security Rule documentation requirements as required by the HITECH Act.

**4.** **Security Incidents.** (a) For security incidents affecting Company's non-Medicare members, Business Associate shall report, within five (5) business days, to Covered Entity any attempted or successful (i) unauthorized access, use, disclosure, modification, or destruction of Electronic Protected Health Information or (ii) interference with Business Associate's system operations in Business Associate's information systems, of which Business Associate discovers. Business Associate will report, within five (5) business days, to Covered Entity any use or disclosure of the PHI not provided for in this Agreement upon discovery of it. (b) As it relates to the aforementioned reporting and incidents that affect Company's Medicare members, Business Associate shall notify Company immediately not to exceed one (1) business day from date of discovery. (c) Business Associate agrees to mitigate, to the

23

extent practicable, any harmful effect that is known to Business Associate of a use or disclosure of PHI by Business Associate in violation of the requirements of this Agreement and shall reimburse Company for the cost of credit monitoring for each individual offered such service by Company for one (1) year following Business Associate's breach of Electronic Protected Health Information or PHI when such service is offered to affected individuals.  d) Business Associate will indemnify and hold Covered Entity harmless from all liabilities, costs and damages arising out of or in any manner connected with the disclosure or security breach by Business Associate of any PHI.

5.     **Information Safeguards.**   Business Associate will develop, implement, maintain and use appropriate administrative, technical and physical safeguards, in compliance with 45 C.F.R. §164.530(c) and any other implementing regulation issued by DHHS that is applicable to Business Associate's obligations with respect to Company's Protected Health Information.  The safeguards will be designed to preserve the integrity and confidentiality of, and to prevent intentional or unintentional non-permitted use or disclosure of Company's Protected Health Information. Business Associate agrees to abide by applicable HITECH regulatory guidance as may be issued subsequently.  Pursuant to federal guidance issued as of April, 2009, the acceptable methods of securing PHI are encryption and destruction.   Access controls and firewalls do not make electronic data secure; redaction of paper documents does not make them secure.  Business Associate agrees to abide by annual regulatory guidance addressing HITECH provisions.

6.     **Subcontractors and Agents.**  Business Associate will require any of its subcontractors and agents, to which Business Associate is permitted by this Addendum or in writing by Company to disclose Company's Protected Health Information to provide reasonable assurance, evidenced by written contract, that such subcontractor or agent will comply with the same privacy and security obligations with respect to Company's Protected Health Information that are applicable to Business Associate under this Addendum. Business Associate shall comply with all applicable federal laws governing first-tier, downstream, and/or related entities as may be relevant to Business Associate's activities. If Business Associate shall use any off-shore personnel to perform any or all of its obligations, and applicable federal law imposes restrictions or requirements regarding the use of such off-shore resources by Business Associate, Business Associate shall provide Company with written notice.

B.     **Compliance with Transaction Standards.**   If Business Associate conducts in whole or part electronic Transactions on behalf of Company for which DHHS has established Standards, Business Associate will comply, and will require any subcontractor or agent it involves with the conduct of such Transactions to comply, with each applicable requirement of 45 C.F.R. Part 162. Business Associate will not enter into, or permit its subcontractors or agents to enter into, any trading partner agreement in connection with the conduct of Standard Transactions on behalf of Company that:

1.     Changes the definition, data condition, or use of a data element or segment in a Standard Transaction;

2.     Adds any data element or segment to the maximum defined data set;

3.     Uses any code or data element that is marked "not used" in the Standard Transaction's implementation specification or is not in the Standard Transaction's implementation specification; or

4.     Changes the meaning or intent of the Standard Transaction's implementation specification.

24

Rev. 01-23-2014

**C.** **Individual Rights.**

1. **Access.** Business Associate will, within 20 days following Company's request, make available to Company or, at Company's direction, to an individual (or the individual's personal representative) for inspection and obtaining copies Company's Protected Health Information about the individual that is in Business Associate's custody or control, so that Company may meet its access obligations under 45 C.F.R. §164.524 and, where applicable, the HITECH Act. Business Associate shall make such information available in an electronic format upon reasonable request of Company.

2. **Amendment.** Business Associate will, upon receipt of notice from Company, promptly amend or permit Company access to amend any portion of Company's Protected Health Information, so that Company may meet its amendment obligations under 45 C.F.R. §164.526.

3. **Disclosure Accounting.** So that Company may meet its disclosure accounting obligations under 45 C.F.R. §164.528:

   a) **Disclosures Subject to Accounting.** Business Associate will record the information specified in Section C(3)(c) below ("Disclosure Information") for each disclosure of Company's Protected Health Information, not excepted from disclosure accounting as specified in Section C(3)(b) below, that Business Associate makes to Company or to a third party.

   b) **Disclosures Not Subject to Accounting.** Business Associate will not be obligated to record Disclosure Information or otherwise account for disclosures of Company's Protected Health Information:

      (i)     That occurred before April 14, 2003;

      (ii)    For Treatment, Payment or Health Care Operations activities (except where such recording or accounting is required by the HITECH Act, and as of the effective dates for this provision of the HITECH Act);

      (iii)   To an individual who is the subject of Company's Protected Health Information disclosed, or to that individual's personal representative;

      (iv)    Pursuant to an authorization compliant with 45 C.F.R. § 164.508 that is signed by an individual who is the subject of Company's Protected Health Information disclosed, or by that individual's personal representative;

      (v)     For notification of and to persons involved in the health care or payment related to the health care of an individual who is the subject of Company's Protected Health Information disclosed and for disaster relief;

      (vi)    To law enforcement officials or correctional institutions in accordance with 45 C.F.R. § 164.512(k)(5);

      (vii)   For national security or intelligence purposes in accordance with 45 C.F.R. § 164.512(k)(2);

      (viii)  In a Limited Data Set;

      (ix)    Incident to a use or disclosure that Business Associate is otherwise permitted to make by this Addendum; and

      (x)     Otherwise excepted from disclosure accounting as specified in 45 C.F.R. § 164.528.

25

**c) Disclosure Information.** With respect to any disclosure by Business Associate of Company's Protected Health Information that is not excepted from disclosure accounting by Section 3(b)(ii) above, Business Associate will record the following Disclosure Information as applicable to the type of accountable disclosure made:

(i)         **Disclosure Information Generally**

Except for repetitive disclosures of Company's Protected Health Information as specified in Section C(3)(c)(ii) below and for disclosures for large Research studies as specified in Section C(3)(c)(iii) below, the Disclosure Information that Business Associate must record for each accountable disclosure is (i) the disclosure date, (ii) the name and (if known) address of the entity to which Business Associate made the disclosure, (iii) a brief description of Company's Protected Health Information disclosed, and (iv) a brief statement of the purpose of the disclosure.  Business Associate further shall provide any additional information to the extent required by the HITECH Act and any accompanying regulations.

(ii)        **Disclosure Information for Repetitive Disclosures**

For repetitive disclosures of Company's Protected Health Information that Business Associate makes for a single purpose to the same person or entity (including Company), the Disclosure Information that Business Associate must record is either the Disclosure Information specified in Section C(3)(c)(i) above for each accountable disclosure, or (i) the Disclosure Information specified in Section C(3)(c)(i) above for the first of the repetitive accountable disclosures, (ii) the frequency, periodicity, or number of the repetitive accountable disclosures, and (iii) the date of the last of the repetitive accountable disclosures.

(iii)       **Disclosure Information for Large Research Activities**

For disclosures of Company's Protected Health Information that Business Associate makes for particular Research involving 50 or more individuals and for which an Institutional Review Board or Privacy Board has waived authorization during the period covered by an individual's disclosure accounting request, the Disclosure Information that Business Associate must record is (i) the name of the Research protocol or activity, (ii) a plain language description of the Research protocol or activity, including its purpose and criteria for selecting particular records, (iii) a brief description of the type of Company's Protected Health Information disclosed for the Research, (iv) the dates or periods during which Business Associate made or may have made these disclosures, including the date of the last disclosure that Business Associate made during the period covered by an individual's disclosure accounting request, (v) the name, address, and telephone number of the Research sponsor and of the researcher to whom Business Associate made these disclosures, and (vi) a statement that Company's Protected Health Information relating to an individual requesting the disclosure accounting may or may not have been disclosed for a particular Research protocol or activity.  Business Associate will, upon request of Company or an individual requesting the disclosure accounting, assist Company or the individual to contact the Research sponsor and the researcher if it is reasonably likely that Company's Protected Health Information relating to the individual was disclosed for the particular Research protocol or activity.

**d)  Availability of Disclosure Information.**  Unless otherwise provided under the HITECH Act, Business Associate will maintain the Disclosure Information for at least seven (7) years following the date of the accountable disclosure to which the Disclosure Information relates.

Rev. 01-23-2014

Business Associate will report the Disclosure Information to Company within 5 (five) calendar days following the accountable disclosure.

Unless it so required by the HITECH Act and/or any accompanying regulations, Business Associate shall not make such Disclosure Information available directly to the affected individual unless Company is notified and response is coordinated between the Company and Business Associate prior to such communication. Business Associate acknowledges that Company shall control all such communication to affected individuals, including telephone calls or other communication to affected individuals about disclosed information.

4. **Restriction Requests: Confidential Communications**. Business Associate will comply with any agreement that Company makes that either (i) restricts use or disclosure of Company's Protected Health Information pursuant to 45 C.F.R. § 164.522(a), or (ii) requires confidential communication about Company's Protected Health Information pursuant to 45 C.F.R. § 164.522(b), provided that Company notifies Business Associate in writing of the restriction or confidential communication obligations that Business Associate must follow and furnishes Business Associate a copy of such agreement. Company will promptly notify Business Associate in writing of the termination of any such restriction agreement or confidential communication requirement and, with respect to termination of any such restriction agreement, instruct Business Associate whether any of Company's Protected Health Information will remain subject to the terms of the restriction agreement.

## D.   **Breach of Privacy Obligations.**

1. **Reporting.**  Business Associate will report to Company any use or disclosure of Company's Protected Health Information not permitted by this Agreement which it discovers.  Business Associate will make the report to Company's Privacy Department (a) For Company's non-Medicare members, Business Associate shall report within five (5) business days, to Covered Entity any attempted or successful (i) unauthorized access, use, disclosure, modification, or destruction of Electronic Protected Health Information or (ii) interference with Business Associate's system operations in Business Associate's information systems, of which Business Associate discovers.  Business Associate will report, within five (5) business days, to Covered Entity any use or disclosure of the PHI not provided for in this Agreement upon discovery of it. (b) As it related to the aforementioned reporting and incidents that affect Company's Medicare members, Business Associate shall, notify Company immediately not to exceed one business day from date of discovery.  (c) Business Associate agrees to mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a use or disclosure of PHI by Business Associate in violation of the requirements of this Agreement and shall reimburse Company for the cost of credit monitoring for each individual offered such service by Company for one (1) year following Business Associate's breach of Electronic Protected Health Information of PHI when such service is offered to affected individuals. (d) Business Associate will indemnify and hold Company harmless from all liabilities, costs and damages arising out of or in any manner connected with the disclosure or security breach by Business Associate of any PHI.  "Breach" of "unsecured Protected Health Information" refers to terms as defined by the HITECH Act and any implementing regulations. Business Associate shall cooperate with Company in investigating the Breach and in meeting the Company's obligations under the HITECH Act including risk analysis and any other security breach notification laws.  Any such report shall include the identification (if known) of each individual whose Unsecured Protected Health Information has been, or is reasonably believed by Business Associate to have been, accessed, acquired, or disclosed during such Breach. Business Associate's report will at least:

27

a)   Identify the nature of the non-permitted access, use or disclosure, including the date of the Breach and the date of discovery of the Breach;

b)   Identify Company's Protected Health Information accessed, used or disclosed as part of the Breach (e.g., full name, social security number, date of birth, etc.);

c)   Identify who or what area of Business Associate's operation made the non-permitted access, use or disclosure and who received the non-permitted disclosure;

d)   Identify what corrective action Business Associate took or will take to prevent further non-permitted accesses, uses or disclosures;

e)   Identify what Business Associate did or will do to mitigate any deleterious effect of the non-permitted access, use or disclosure; and

f)   Provide such other information, including a written report, as Company may reasonably request.

g)   Provide such other information as may be required pursuant to subsequently issued HITECH regulations or regulatory bodies.

h)   Provide to the Company immediate notification and information related to any breach inquiry received in any form when Business Associate is contacted by a regulatory body.

## 2.   Termination of Agreement.

a)   <u>Right to Terminate for Breach.</u>  Company may terminate Agreement if it determines, in its sole discretion, that Business Associate has breached any material provision of this Addendum and upon written notice to Business Associate of the breach, Business Associate fails to cure the breach within thirty (30) days after receipt of the notice. Company may exercise this right to terminate Agreement by providing Business Associate written notice of termination, stating the failure to cure the breach of the Addendum that provides the basis for the termination.  Any such termination will be effective immediately or at such other date specified in Company's notice of termination.   If for any reason Company determines that Business Associate has breached the terms of this Addendum and such breach has not been cured, but Company determines that termination of the Agreement is not feasible, Company may report such breach to the U.S. Department of Health and Human Services.

b)   Business Associate may terminate Agreement if it determines, after reasonable consultation with Company, that Company has breached any material provision of this Addendum and upon written notice to Company of the breach, Company fails to cure the breach within thirty (30) days after receipt of the notice.  Business Associate may exercise this right to terminate Agreement by providing Company written notice of termination, stating the failure to cure the breach of the Addendum that provides the basis for the termination.  Any such termination will be effective upon such reasonable date as the parties mutually agree.  If Business Associate reasonably determines that Company has breached the terms of this Addendum and such breach has not been cured, but Business Associate and Company mutually determine that termination of the Agreement is not feasible, Business Associate may report such breach to the U.S. Department of Health and Human Services.

Rev. 01-23-2014

HCI MASTER LICENSE AGREEMENT

c)   Right to Terminate on Regulation Change.  Either Company or Business Associate may terminate Agreement if amendment or addition to 45 C.F.R. Parts 160-64 or the HITECH Act affects the obligations under this Addendum or the party.

d)   Obligations upon Termination.

(i)   Return or Destruction of Company's Protected Health Information, as Feasible. Upon termination or other conclusion of this Addendum or the Agreement, Business Associate will, if feasible, either return to Company or destroy all of Company's Protected Health Information in whatever form or medium including all copies thereof and all data, compilations, and other works derived therefrom that allow identification of any individual who is a subject of Company's Protected Health Information.  Business Associate will require any subcontractor or agent, to which Business Associate has disclosed Company's Protected Health Information as permitted by Section A(6) of this Addendum to, if feasible, return to Business Associate (so that Business Associate may return it to Company) or destroy all of Company's Protected Health Information in whatever form or medium received from Business Associate, including all copies thereof and all data, compilations, and other works derived therefrom that allow identification of any individual who is a subject of Company's Protected Health Information, and certify on oath to Business Associate that all such information has been returned or destroyed.  Business Associate will complete these obligations as promptly as possible, but not later than 20 days following the effective date of the termination or other conclusion of Agreement.

(ii)   Procedure When Return or Destruction Is Not Feasible.  Business Associate will identify any of Company's Protected Health Information, including any that Business Associate has disclosed to subcontractors or agents as permitted by Section A(6) of this Addendum that cannot feasibly be returned to Company or destroyed and explain why return or destruction is infeasible.   Business Associate will limit its further use or disclosure of such information to those purposes that make return or destruction of such information infeasible. Business Associate will, by its written contract with any subcontractor or agent to which Business Associate discloses Company's Protected Health Information as permitted by Section A(6) of this Addendum, require such subcontractor or agent to limit its further use or disclosure of Company's Protected Health Information that such subcontractor or agent cannot feasibly return or destroy to those purposes that make the return or destruction of such information infeasible.  Business Associate will complete these obligations as promptly as possible, but not later than 20 days following the effective date of the termination or other conclusion of Agreement.

(iii)   Continuing Privacy and Security Obligation.  Business Associate's obligation to protect the privacy and safeguard the security, confidentiality, and integrity of Company's Protected Health Information as specified in this Addendum will be continuous and survive termination, cancellation, expiration or other conclusion of this Addendum or the Agreement.

29

Rev. 01-23-2014

**(iv)**   Other Obligations and Rights.  Business Associate's other obligations and rights and Company's obligations and rights upon termination or other conclusion of Agreement will be those set out in the Agreement.

**3.**   **Indemnification.**   Business Associate will indemnify and hold harmless Company and any Company affiliate, officer, director, employee or agent from and against any claim, cause of action, liability, damage, cost or expense, including, without limitation, reasonable attorneys' fees and court costs, arising out of or in connection with any non-permitted or violating use or disclosure of Protected Health Information or other breach of this Addendum by Business Associate or any subcontractor, or agent, of Business Associate or other person or entity under Business Associate's control.

Company will indemnify and hold harmless Business Associate and any Business Associate affiliate, officer, director, employee or agent from and against any claim, cause of action, liability, damage, cost or expense, including, without limitation, reasonable attorneys' fees and court costs, arising out of or in connection with Company's release of non-permitted Protected Health Information to Business Associate and/or Company's failure to notify Business Associate of any changes in, or revocation of, permission by an individual to use or disclose the individual's Protected Health Information, which changes affect Business Associate's permitted or required uses or disclosures.

**E.**   **General Provisions.**

**1.**   **Inspection of Internal Practices, Books, and Records.**  Business Associate will make its internal practices, books, and records, relating to its use and disclosure of Company's Protected Health Information available to Company and to DHHS for audit purposes and to determine Company's compliance with 45 C.F.R. Parts 164, Subpart E "Privacy of Individually Identifiable Health Information."

**2.**   **Definitions.**  The capitalized terms "Covered Entity," "Electronic Protected Health Information," "Protected Health Information," "Standard," and "Transaction" have the meanings set out in 45 C.F.R. § 160.103.  The term "Required by Law" has the meaning set out in 45 C.F.R. § 164.103.  The terms "Health Care Operations," "Payment,"  "Research," and "Treatment" have the meanings set out in 45 C.F.R. § 164.501.  The terms "Limited Data Set" and "Standard Transaction" have the meanings set out in, respectively 45 C.F.R. § 164.514(e) and 45 C.F.R. § 162.103.  The term "use" means, with respect to Protected Health Information, utilization, employment, examination, analysis or application within Business Associate.  The terms "disclose" and "disclosure" mean, with respect to Protected Health Information, release, transfer, providing access to or divulging to a person or entity not within Business Associate. For purposes of this Addendum, Company's Protected Health Information encompasses Company's Electronic Protected Health Information.  Any other capitalized terms not identified here shall have the meaning set forth in 45 Code of Federal Regulations Parts 160-164 for the Administrative Simplification provisions of Title II, Subtitle F of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), or in the HITECH Act, as incorporated in ARRA.

**3.**   **Amendment to Agreement.**  Upon the compliance date of any final regulation or amendment to final regulation promulgated by DHHS that affects Business Associate's use or disclosure of Company's Protected Health Information or Standard Transactions, the Agreement and this Addendum will automatically amend such that the obligations imposed on Business Associate remain in compliance with the final regulation, unless Company or Business Associate elects to terminate Agreement in accordance with Section D(2)(b) of this Addendum.

4. **Interpretation.** This Addendum shall be interpreted as broadly as necessary to implement and comply with HIPAA, the HITECH Act, the regulations promulgated thereunder (45 C.F.R. Parts 160-164) and applicable state laws. The parties agree that any ambiguity in this Addendum shall be resolved in favor of a meaning that complies and is consistent with these laws and regulations.

F. **Conflicts.** Notwithstanding anything to the contrary in this Addendum, the provisions herein supersede, override, and control any prior Addendum to Agreement with Business Associate or similar business associate document between the parties, provided, however, there shall not be any limitation of liability with respect to Business Associate's breach under this Addendum. All non-conflicting terms and conditions of the Agreement remain in full force and effect.

G. **Counterparts.** This Addendum may be executed in counterparts via facsimile, with each executed counterpart being deemed an original, but both of which together shall constitute one and the same instrument

**IN WITNESS WHEREOF,** Company and Business Associate execute this Addendum to be effective as of the Effective Date.

**Healthcare Interactive, Inc.**                              **Customer**

By: _____                 By: _____

Title: _____Presiden t_____           Title: _____C.E.O._____

Print Name: ___Henry Cha_____             Print Name: __ROBERT W. POMREY__

Date: _____1/29/14_____             Date: _____1/29/14_____

Rev. 01-23-2014

**Includes P2Pme, admin, ar, go**
**All prices are PEPM unless otherwise noted.**
**Pricing for Enrollment Tiers goes into effect for all current enrollments once a new tier is reached, but will paid at minimum of each tier.**
**Monthly minimum fee for P2P Cloud is$15,000.**

| Tiered Pricing | P2P Cloud Base | ACG PM/GIC* | Data Storage* | Archiving* | Telehealth** (+35/visit) | Optum PM** | Optum GIC** |
|---|---|---|---|---|---|---|---|
| 0-50,000 | $1.10 | $ 0.25 | $ 0.25 | $ 0.10 | $1.00 | $0.30 | $0.35 |
| 50,001-100,000 | $1.00 | $ 0.20 | $ 0.20 | $ 0.08 | TBD | TBD | TBD |
| 100,001-200,000 | $0.85 | $ 0.15 | $ 0.15 | $ 0.06 | TBD | TBD | TBD |
| 200,001+ | $0.70 | $ 0.12 | $ 0.12 | $ 0.05 | TBD | TBD | TBD |

*Discount pricing for number of Ees in each tier, i.e. for total of 150,000 Ees = 100,000 Ees in tier 1 and 50,000 Ees in tier 2
** To achieve better tiered pricing, these products require commitment levels, which needs to be negotiated with each vendor

**POMCO Proposed Pricing**

| Tiered Pricing | P2P Cloud Base | Discount | Number of Ees | Pomco Suggested Pricing | Costs @ Number of Ees/Mo | Total/Yr | Costs Every 100,000 Ees/Yr |
|---|---|---|---|---|---|---|---|
| 0 - 15,000 | $1.00 | 20% | 15000 | $ 1.00 | $ 15,000 | $ 180,000 | |
| 15,001 - 40,000 | $0.90 | 28% | 40000 | 0.90 | $ 36,000 | $ 432,000 | |
| 40,001 - 80,000 | $0.80 | 36% | 80000 | 0.80 | $ 64,000 | $ 768,000 | |
| 80,001 - 160,000 | $0.70 | 44% | 100000 | 0.80 | $ 80,000 | $ 960,000 | 960,000 |
| 160,001+ | $0.50 | 60% | 160000 | $0.70 | $ 112,000 | $ 1,344,000 | |
| | | | 200000 | $0.50 | $ 100,000 | $ 1,200,000 | 240,000 |
| | | | 300000 | $0.50 | $ 150,000 | $ 1,800,000 | 600,000 |

**HCI Pricing**

| Tiered Pricing | P2P Cloud Base | Discount | Minimum Costs/mo | Approx. Free Ees | Number of Ees | HCI Tiered Pricing | Costs @ Number of Ees/Mo | Total/Yr | Costs Every 100,000 Ees/Yr |
|---|---|---|---|---|---|---|---|---|---|
| 0-50,000* | $1.10 | 12% | $15,000 | | 15000 | $1.10 | 16,500 | $198,000 | |
| 50,001-100,000 | $1.00 | 20% | $55,000 | 5,000 | 50000 | $1.10 | 55,000 | $660,000 | |
| 100,001-200,000 | $0.85 | 32% | $95,000 | 17,000 | 55000 | $1.00 | 55,000 | $660,000 | |
| 200,001+ | $0.70 | 44% | $160,000 | 42,000 | 100000 | $1.00 | 100,000 | $1,200,000 | 1,200,000 |
| | | | | | 117000 | $0.85 | 99,450 | $1,193,400 | |
| | | | | | 200000 | $0.85 | 170,000 | $2,040,000 | 840,000 |
| | | | | | 242000 | $0.70 | 169,400 | $2,032,800 | |
| | | | | | 300000 | $0.70 | 210,000 | $2,520,000 | 480,000 |

**Licensing to all PHM Modules for direct care management and navigator workflows**
**Includes ACG Predictive Modeling**
**Includes free Wellness Presales Analysis for groups sizes 500 Ees and larger.**

| Tiered Pricing | P2P - PHM Modules | |
|---|---|---|
| 0-100,000* | $1.35 | |
| 100,001-200,000 | $1.15 | |
| 200,001-300,000 | $1.00 | |
| 301,001+ | $0.90 | |

*Discount pricing for number of Ees in each tier, i.e. for total of 150,000 Ees = 100,000 Ees in tier 1 and 50,000 Ees in tier 2

**HCI Running Pop Health as Private Label for POMCO**
**POP Health Data Will Be Synced with POMCO's Reporting DataWarehouse**

| Groups Size | Base Price 1-200 (flat monthly fee) | Volume Discount 201-500 | Volume Discount 501-2,000 | Volume Discount 2,001-5,000 | Volume Discount 5,001-10,000 | Volume Discount 10,000+ |
|---|---|---|---|---|---|---|
| Gold Minimum Retail Pricing | $1,600.00 | $7.95 | $7.70 | $7.45 | $7.20 | $6.95 |
| POMCO Commission | $400.00 | $1.50 | $1.45 | $1.40 | $1.35 | $1.25 |
| HCI Costs | $1,200.00 | $6.45 | $6.25 | $6.05 | $5.85 | $5.70 |
| Commission % | 25.0% | 18.9% | 18.8% | 18.8% | 18.8% | 18.0% |

| Group Size | Base Price 1-200 | Volume Discount 201-500 | Volume Discount 501-2,000 | Volume Discount 2,001-5,000 | Volume Discount 5,001-10,000 | Volume Discount 10,000+ |
|---|---|---|---|---|---|---|
| Silver Minimum Retail Pricing | $6.20 | $5.95 | $5.70 | $5.45 | $5.20 | $4.95 |
| POMCO Commission | $1.00 | $1.00 | $1.00 | $1.00 | $1.00 | $1.00 |
| HCI Costs | $5.20 | $4.95 | $4.70 | $4.45 | $4.20 | $3.95 |
| Commission % | 16.1% | 16.8% | 17.5% | 18.3% | 19.2% | 20.2% |

| Group Size | Base Price 1-200 | Volume Discount 201-500 | Volume Discount 501-2,000 | Volume Discount 2,001-5,000 | Volume Discount 5,001-10,000 | Volume Discount 10,000+ |
|---|---|---|---|---|---|---|
| Bronze Minimum Retail Pricing | $199.00 | $189.00 | $179.00 | $169.00 | $159.00 | $149.00 |
| POMCO Commission | $30.00 | $29.00 | $28.00 | $27.00 | $26.00 | $25.00 |
| HCI Costs | $169.00 | $160.00 | $151.00 | $142.00 | $133.00 | $124.00 |
| Commission % | 15.1% | 15.3% | 15.6% | 16.0% | 16.4% | 16.8% |

| Total Enrolled Live by Customer In the Gold or Silver Program | Bonus PEPM |
|---|---|
| 0-15000 | $0.00 |
| 10,001-20,000 | $0.10 |
| 20,001-40,000 | $0.25 |
| 40,001-80,000 | $0.45 |
| 80,001+ | $0.50 |

Bonuses are paid by total number of Ees in each tier on a quarterly basis as a "marketing bonus."

Note that screening events can be designed so as to offer a combination of onsite/ offsite / by mail screening options for maximum convenience and economy

| Screenings: | Screens For: | Includes: | Service Center Pricing | Service Center Partner Commissions | Onsite Pricing* | Onsite Partner Commissions | Mail Pricing | By Mail Partner Commissions |
|---|---|---|---|---|---|---|---|---|
| Onsite Biometrics | BMI, Blood Pressure | Blood Pressure Cuff, Height, Weight, Waist Circumference | tbd-available 2014 | | included | | tbd | |
| Wellness 1 (instant results fingerstick) | Cholesterol, Diabetes | Lipid Panel(T. Chol, Trigly, HDL, VLDL, LDL), Glucose | | | $ 55.00 | $ 5.50 | | |
| Wellness 1 (venipuncture) | Cholesterol, Diabetes | Lipid Panel(T. Chol, Trigly, HDL, VLDL, LDL), Glucose | $ 70.00 | | $ 55.00 | $ 5.50 | | |
| Wellness 2 (venipuncture) | Cholesterol, Diabetes, Long Term Diabetes Control | Lipid Panel(T. Chol, Trigly, HDL, VLDL, LDL), Glucose, HbA1c | $ 95.00 | $ 9.50 | $ 75.00 | $ 7.50 | n/a | |
| Wellness 3 (venipuncture) | Cholesterol, Diabetes, Thyroid | Lipid Panel(T. Chol, Trigly, HDL, VLDL, LDL), Glucose, TSH | $ 95.00 | $ 9.50 | $ 75.00 | $ 7.50 | n/a | |
| Wellness 4 (venipuncture) | Cholesterol, Diabetes, Long Term Diabetes Control, Thyroid | Lipid Panel(T. Chol, Trigly, HDL, VLDL, LDL), Glucose, TSH, HbA1c | $ 105.00 | $ 10.50 | $ 95.00 | $ 9.50 | n/a | |
| Wellness 5 (venipuncture) | Cholesterol, Diabetes, Long Term Diabetes Control, Thyroid, Liver, Heart Health, Comprehensive Metabolic, Complete Blood Count | Glucose, Uric Acid, BUN, Creatinine, BUN/Creatinine Ratio, Sodium, Potassium, Chloride, Calcium, Total Protein, Albumin, Globulin, A/G Ratio, Total Bilirubin, Direct Bilirubin, Alkaline, AST (SGOT), ALT (SGPT), GGT, Iron, UIBC, Iron Serum, Iron Saturation, Ferritin, Lipid Panel(T. Chol, Trigly, HDL, VLDL, LDL), T. Chol/HDL Ratio, C-Reactive Protein Cardiac, TSH, T4 Free (Direct), eGFR if Non Afric Am, eGFR if Afric Am Hematocrit, Hemoglobin, MCH,MCHC,MCV,RDW,RBC,Platelets,WBC | $ 135.00 | $ 10.50 | $ 115.00 | $ 9.50 | n/a | |

Add-ons must be paired with Wellness screening 1-5

| Add-on Testing | |
|---|---|
| Cotinine | $30 Labcorp/ $20 Onsite |
| Comprehensive Metabolic | $ 15.00 |
| PSA | $ 20.00 |
| TSH | $ 25.00 |
| HbA1C | $ 25.00 |
| CBC | $ 7.00 |

| Onsite Set-Up Expenses | |
|---|---|
| Setup Fee | |
| | No setup fee for > 20 members/ event/ location |
| | $150 setup fee for < 21 members/ event/ location |
| Lab and Biometric Screening Staff | |
| 7 AM to 7 PM | $65/hr/staff member |
| 7 PM to 7 AM | $85/hr/staff member |
| | 4 hr minimum/ event/ location |
| Travel Expenses | |
| Local Mileage Expense | $.58/mile |
| Hotel, Airfare, Meals | Pass through costs |